UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KENYA SMITH,

              Plaintiff,

      v.

ALLSCRIPTS HEALTHCARE SOLUTIONS,
INC.,

              Defendant.

No. 20 CV 7261

Judge Manish S. Shah

MEMORANDUM OPINION AND ORDER

Plaintiff Kenya Smith was a successful Director of Solutions Management at defendant Allscripts Healthcare Solutions in the spring of 2020 when the COVID-19 pandemic hit and Allscripts imposed sharp cost-cutting measures. Smith was laid off from her position and now brings race-discrimination claims under Title VII and § 1981 and alleges a violation of the Equal Pay Act. But the employment actions of which she complains are either explained by a legitimate, non-discriminatory rationale or not materially adverse to her. For that reason, Allscripts' motion for summary judgment is granted.

## I.    Legal Standard

Summary judgment is appropriate if there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 928 (7th Cir. 2020). A court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). A court should "state the case in the light reasonably most

favorable to the [non-movant], giving her the benefit of conflicts in the evidence and reasonable inferences from the evidence, but without vouching for the objective truth of any fact or expressing any opinion on the weight of evidence." *Id*. at 924–25. Once that is done, the court should see if there is "enough evidence that a reasonable jury could return a verdict in favor of the nonmoving party." *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1104 (7th Cir. 2012). If not, then summary judgment is appropriate.

## II. Facts

Allscripts provides healthcare management solutions and services to physician offices, hospitals, and post-acute care organizations. [44] ¶ 1.[1] Smith is an African-American woman who was formerly employed by Allscripts, most recently as Director of Solutions Management. [44] ¶ 2. Smith was initially hired by Allscripts in 2015 to be a Senior Project Manager in Raleigh, North Carolina. [44] ¶ 7. At her first performance review at the end of 2015, Smith was promoted to be a manager without her asking or applying for the position. [44] ¶ 10. In 2018, she was promoted to Senior Technical Support Manager. [44] ¶ 15. While in both positions, Smith was rated a "3-successful" by her managers, who reported that Smith was someone with "solid potential to do great things" and that she "leverage[d] her strong experience with processes across functional groups." [44] ¶ 9–12, 15–16.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, except in the case of citations to depositions, which use the deposition transcript's original page number. The facts are largely taken from Smith's response to Allscripts' Local Rule 56.1 statement, [44], and Allscripts' response to Smith's statement of additional material facts, [48], where both the asserted fact and the opposing party's response are set forth in one document.

After about a year as Senior Technical Support Manager, Smith applied to be Director of Solutions Management in Allscripts' Consumer Business Unit, a new position in the unit. [44] ¶ 17–18.[2] Vice President of Consumer Health, Kim Franks, posted, interviewed, and hired for the position. [44] ¶ 19. In April 2019, Smith accepted the position of Director of Solutions Management in the Consumer Business Unit, with a starting salary of $145,000, an increase from her previous salary of about $121,000. [44] ¶ 22–23.

As part of her application to the new position, Smith had requested a salary of $145,000. [44] ¶ 22. The position had a minimum salary of $143,028 and a mid-point salary of $193,000. [48] ¶ 20.[3]

In determining a salary for a new hire, Franks would look at: the minimum salary for the position, the applicant's desired salary, the applicant's experience, and, if they are being promoted from within the company, their prior salary. [44] ¶ 20.[4] If a new hire had no prior experience in the role for which she was being hired, Franks

---

[2] One of the bases of the race-discrimination claims is that Smith was not promoted as non-Black employees were, specifically that she had to apply to positions outside of her business unit in order to be promoted. [44] ¶¶ 67, 68. Having to apply to positions outside of her business unit required Smith to express her skills and abilities to someone who was unfamiliar with her work and to go through additional rounds of interviews. [44] ¶ 68.

[3] Defendant partially objects to this statement as unsupported by the record citation and argumentative. [48] ¶ 20. Plaintiff's cited evidence reflects that, according to the company's HR department, the minimum and mid-point salary for the position were $143,028 and $193,000, respectively. [45-3] at 2. I ignore Smith's remarks about the relative position of her $145,000 salary to the minimum and mid-point.

[4] Plaintiff makes the same statement in response to defendant's statements ¶¶ 20, 21, 46, 49, 50, 61, 76: "Admitted to the extent that the above is Defendant's statement." This does not controvert the asserted facts. Each of the statements listed above is supported by deposition testimony, affidavits, or exhibits and is thus deemed admitted. N.D. Ill. Local R. 56.1(e)(3).

would offer closer to the minimum salary. [44] ¶ 21. For a new hire with more experience, Franks would offer nearer the salary "midpoint," but she would never offer more than the salary midpoint for a new hire. *Id*. The company's hiring team decided on Smith's $145,000 salary based on the minimum salary for the position, her lack of experience in a director role, her requested salary, and her previous salary. [44] ¶ 22.

As part of the promotion, Smith was going to move to Litchfield, Illinois. Franks wanted Smith to relocate and told her about a property for sale two houses down from Franks's house. [44] ¶ 24. Smith did not end up relocating but was paid a $15,000 relocation bonus. *Id*.[5]

### A.     Smith's Tenure as Director of Solutions Management

The Director of Solutions Management within the Consumer Business Unit handled new products that Allscripts was trying to launch. [44] ¶ 25. The new products under Smith's purview were a "Wellness product" to be delivered to Bank of America (and related pilot projects) and a partnership with Extended Care to create a "bedside product" called "Follow My Health." [44] ¶ 25.[6]

At the end of 2019, Franks rated Smith a "3-Successful" and stated that Smith was a "very good addition to the Consumer BU for solutioning" and "extremely

---

[5] The additional facts that plaintiff includes in her response to this statement are not properly before the court. *See* N.D. Ill. Local R. 56.1(e)(2) ("A response may not set forth any new facts.").

[6] Plaintiff objects in part to defendant's paragraph 25 because it includes a reference to the product Avenel, for which Smith was never responsible. [44] ¶ 25. Plaintiff's evidence properly controverts that fact. While there may have been plans for Smith to take over the Avenel product, those plans did not come to fruition. [45-6] at 71:08–22.

valuable." [44] ¶ 26. This positive review resulted in a 2.5% increase in Smith's salary, to an annual salary of about $148,000 and a $6,510 bonus paid out in March 2020. [44] ¶ 27. Franks described Smith as a "really good employee," who was a competent people manager. [48] ¶ 18.[7]

Despite this positive review, Smith felt that Franks treated her differently than other supervisees. Franks would joke, laugh, and be more engaged with white colleagues but used "the least amount of words said as possible" with Smith. [48] ¶ 2[8]; [45-5] at 166:11–24. When asked if she and Franks had any issues, Smith responded, "She's a white female and I'm a Black female" and elaborated that, in her opinion, Franks was not as comfortable being a manager to a Black woman. [44] ¶ 69. Smith also felt that Franks took a "hands-off approach" with her. [48] ¶ 3. The most specific evidence Smith provided was that she was supposed to have a weekly call with Franks, but it was frequently cancelled and the two only spoke about "once a month." [48] ¶1.[9]

---

[7] Defendant objects in part to plaintiff's paragraph 18 because plaintiff posits whether a course of action "would have made more sense" without support from the cited evidence. [48] ¶ 18. I ignore arguments in Local Rule 56.1 statements. N.D. Ill. Local R. 56.1(d)(4).

[8] Defendant objects in part to this statement because it is unsupported by the record citation. Defendant is correct; it is more accurate to cite a longer portion of the deposition transcript. *See* [45-5] at 166:11–24. Because the record itself supports the fact and because the facts should be viewed in the light most favorable to the non-movant, *see Joll*, 953 F.3d at 924–25, defendant's objection is overruled.

[9] Defendant objects in part to this statement as argumentative and unsupported by the record citation. [48] ¶ 1. The record citation only supports the assertion that Smith and Franks had a weekly call that often got cancelled, leading them to speak about once a month. *See* [45-5] at 168:1–5. Defendant itself stated that Franks and Smith did not have regular meetings. *See* [44] ¶ 53 ("Up until this point, Ms. Franks and Plaintiff had not been having regular one-on-one meetings."). I consider only the fact that there was a weekly call that was often cancelled. In her brief Smith also refers to the fact that she was never given a plan of action for the Bank of America Wellness product as evidence of Franks's "hands-off" approach. [43]

5

### B.     Critiques and Communications Regarding Race

In January 2020, Allscripts held its annual sales conference known as the Global Kick Off in Florida. [44] ¶ 28. During her attendance at the conference Smith approached the company's CEO Paul Black and introduced herself. [44] ¶ 30. After the end of the conference, Smith emailed Black to follow up on their interaction. [44] ¶ 32. Smith stated that it was a pleasure to meet him and offered that she would be delighted to participate in any 2020 Diversity and Inclusion initiatives because she had a unique perspective to offer the initiative. *Id*.; [42-1] at 276. Black did not reply but did forward her email to the then-Director of Human Resources. [44] ¶ 34.[10] Franks was not aware that Smith had emailed the CEO or that Smith had any interest in getting involved in diversity and inclusion initiatives. [44] ¶ 35.[11]

After George Floyd's murder, Black sent an email to all Allscripts employees and stated, "Businesses across all industries must evaluate their existing processes

at 7–8.  Only facts included in a Local Rule 56.1 statement are properly before the court and can be considered. *See Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) *citing Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995).

[10] The additional facts that plaintiff includes in her response to defendant's paragraph ¶ 34 are not properly before the court. *See* N.D. Ill. Local R. 56.1(e)(2) ("A response may not set forth any new facts.").

[11] Defendant notes several facts about the Global Kick Off—that Smith first said she only saw one other Black employee at the conference and then said three other Black employees were there, that she did not raise any of her complaints while speaking with the CEO, and that she said both that the purpose of her email was to volunteer her skills and time and that the email was a "cry for help." [44] ¶¶ 29, 31, 33. These statements seem to be aimed at chipping away at Smith's credibility. At the summary judgment stage, I make no decisions regarding credibility and therefore disregard these statements. *See Reinebold v. Bruce*, 18 F.4th 922, 927 (7th Cir. 2021) ("A district court judge may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts when ruling on a motion for summary judgment.") (citations omitted).

and policies regarding diversity and inclusion and commit to doing better, Allscripts included. We must do our part." [44] ¶ 36. Also included in the email was contact information to learn about the company's Black Folks United group and a recognition that HR had launched the Allscripts Diversity and Inclusion Committee. [44] ¶ 37.[12]

Smith responded to the CEO's email two days later and stated, in part, "as an African American wom[a]n I cannot begin to express the various levels of oppression and racism I have endured during my tenure at Allscripts … I am willing to be part of the solution of ending the systemic racist practices at Allscripts." [44] ¶ 38. Smith took two days before responding to the initial email because she needed time to process and wanted to make sure she "didn't respond out of anger or any other emotion." [48] ¶ 9. Smith did not include anyone else in management in her response; Franks was not aware that Smith sent this email to the CEO. [44] ¶¶ 39, 56.

Smith had trouble hiring diverse candidates and attributed that difficulty to racist practices. Specifically, when Smith sought to hire J.W., an African American woman who was qualified for the position of project manager, one of her peers (a white woman) coded J.W. as "not qualified." [48] ¶¶ 4–5;[13] *see also* [44] ¶ 13. Smith

---

[12] Plaintiff objects to this statement on the basis that the Allscripts Diversity and Inclusion *Initiative* did not launch until on or about August 29, 2020. [44] ¶ 37. First, a committee and an initiative are two different things. Second, the email plaintiff relies on doesn't show the date it was sent or received. [45-1] at 1–2. The fact was not properly controverted and is admitted.

[13] Defendant objects to plaintiff's statements regarding her experiences in hiring African Americans as unsupported by the record citation and contradicted by Smith's deposition testimony in which she stated she could not think of any racial minority aside from J.W. that she had trouble hiring. [48] ¶¶ 4–5. The record citation supports that Smith testified she "was trying to get a more diverse candidate pool." [45-5] at 149:9–11. Specifically, Smith testified that she "experienced a very difficult time with bringing in qualified project managers," [45-5] at 149:22–23, and described her experience in trying to hire J.W. [45-5] at 150:19–151:4.

testified that she "could tell that [her peers] were a little bit more sensitive to hiring … diverse candidates." [48] ¶ 5. J.W. was ultimately hired and Smith could not think of any other candidate who was a racial minority whom she could not hire. [44] ¶ 14.

Smith shared her frustrations over the scarcity of minority employees at Allscripts and her concerns about discrimination. In February 2018, Smith voiced her concerns to Angela Atkinson, then HR Partner at Allscripts. [48] ¶ 7.[14] Around the same time, Smith had a conversation with an HR recruiter at Allscripts, about the need to recruit at historically Black colleges and universities. Smith told the recruiter that she would volunteer to recruit at historically Black colleges and universities. [48] ¶ 8.[15]

## C.    Smith's Termination

In the spring of 2020, the company's Chief Financial Officer decided that the COVID-19 pandemic required reducing labor costs through temporary salary reductions and a company-wide workforce reduction. [44] ¶ 40. The CFO and CEO notified Allscripts employees that the company would reduce its workforce by 5%

---

Plaintiff's editorial remarks are excluded but the facts supported by deposition testimony are included.

[14] Defendant objects to this statement because it is not supported by the record citation. [48] ¶ 7. The citation in plaintiff's Local Rule 56.1 statement is incorrect; Smith discusses her report to Atkinson earlier in the deposition. *See* [45-5] at 267:16–268:7. However, because the record does support the asserted fact and the record should be viewed in the light most favorable to the non-movant, defendant's objection is overruled.

[15] Defendant objects to this statement on the basis that it is unsupported by the record citation and contains hearsay. [48] ¶ 8. The sentence that contains hearsay is excluded. The record supports that Smith had a conversation with the recruiter about recruiting at historically Black colleges and universities and that she would volunteer to do the recruiting. [45-5] at 269:4–12; 273:20–21. The last clause in the last sentence of this paragraph is excluded because it is not supported by the record.

beginning on April 8, 2020, and implement a temporary salary reduction for employees earning more than $100,000. [44] ¶ 41. The CFO gave the head of each business unit a cost reduction target, which was passed on to Franks with full discretion on how to meet the target. [44] ¶¶ 42–43; [48] ¶ 17.[16]

Franks first closed all open job requisitions and then considered layoffs for employees who were not performing at the level they should have been or were associated with Avenel, a failing product. [44] ¶ 44. Smith had been performing her job in a satisfactory manner and was not closely associated with Avenel, so she was not included in the first round of layoffs. [44] ¶ 45. Franks submitted seven positions for termination in April 2020; of the individuals who were laid off, six were white and one was Asian. *Id*. Layoffs continued periodically throughout April, May, and June 2020 as business units adjusted to the reduction in force. [44] ¶ 46.

Around March and April 2020, there were indicators that Bank of America would not be moving forward with its "Wellness product." [44] ¶ 47. At the same time, the Wellness product pilots were winding down. [44] ¶ 48. Extended Care, the partner for the "bedside product" Smith was working on, suggested that they would not have a product to take to market. *Id*. In May 2020, Franks submitted Smith's position to HR for job elimination due to "the vast majority of [Smith's] job no longer being a part

---

[16] Defendant objects to plaintiff's paragraphs 11, 12, 13, 15, and 17 as "unnecessarily duplicative" of its own 56.1 statements. [44] ¶¶ 11, 12, 13, 15, 17. These objections are noted but overruled. Plaintiff may choose how to use her available additional statements of fact.

of [Allscripts'] business." [44] ¶ 49; *see also*, [48] ¶ 16.[17] The Wellness product and the Extended care product comprised about 60% of Smith's work. [44] ¶ 48.

Franks discussed her decision with the head of the Consumer Business Unit and the company's Vice President to see if there was another place where Smith could work at the director level. [44] ¶ 50; [48] ¶ 12.[18] Although the company's HR Business Partner and legal team reviewed the decision, it was Franks who had the ultimate decision-making authority regarding Smith's termination. [44] ¶ 51; [48] ¶ 15.

On June 10, 2020, Smith met with Franks and an HR representative and was notified that her employment would be terminated effective June 17, 2020, due to the elimination of her position. [44] ¶ 55. Smith was the only person from the Consumer Business Unit who was terminated effective June 17, 2020. [48] ¶ 19. Smith declined the severance pay offered (and accompanying release of claims). [44] ¶ 57; *see* [42-1] at 324–25. After the meeting, HR sent Smith an email with information about their "offboarding process." [44] ¶ 58. Smith emailed the CEO:

> I was informed today that my position was eliminated. While I understand certain eliminations are required, I still question if people of color are eliminated at a higher percentage rate than our Caucasian counterparts. I hope that you turn your words into action to address the racial problems that exist here.

---

[17] Plaintiff also states that litigation with Bank of America was a reason for her termination. [48] ¶ 14. But there is no record evidence to support the assertion. *See id*. The uncontroverted evidence is that "[Smith] was terminated solely for the vast majority of her job no longer being a part of our business." [45-6] at 75:3–5; *see also*, [44] ¶¶ 47–49. The record does support, however, the fact that Smith did a good job on the Bank of America project and could not have done anything to get the program out of the pilot phase more quickly. *See* [45-6] at 49:13–15, 48:18–22.

[18] Franks did not speak with the CEO about her decision to terminate Smith's job. *See* [44] ¶ 56.

[44] ¶ 59; [42-1] at 319. Smith did not receive a response to her email and does not know if the CEO ever saw her email. [44] ¶ 60.

The company's HR team sent Smith's resume to various managers within the company to see if she would be a good match for their open positions. [44] ¶ 61; [45-1] at 340, 346–48. Smith was not aware of these efforts and did not remember receiving further contact from the managers. [48] ¶ 13.[19]

## D.    The Company's Pay and Termination Statistics

Smith had various conversations with other Allscripts employees in which she was told that other male or white Director-level employees made much more than she did. [44] ¶¶ 72, 75, 77. The specific comparators on which both Smith and Allscripts focus are Terry H., a white man who worked as Director of Solutions Management in the Pittsburgh office, and Skyler W., a white man who worked as a Director of Product Management in the Raleigh office. [44] ¶¶ 73, 77.[20]

Terry H. earned an annual salary of $185,000 at the time of Smith's firing. [44] ¶ 73; [48] ¶ 11. He was hired as a Director of Solutions Management at Allscripts in July 2019 and came to Allscripts with thirty-five years' experience in the healthcare

---

[19] Defendant objects to this statement as argumentative and unsupported by the record citation. But the record supports that Smith did not know about the emails and, to her memory, she had not been contacted by any of the managers. [45-5] at 252:22–253:23 ("Q: Have you ever seen this email before? A: I have not."). Perhaps a better citation to support the assertion that Smith did not receive a response would be [45-5] at 253:21-22 ("What I can say is that I never had anyone reach out to me") and 257:13–15 ("I do not recall seeing those. I'm not saying I didn't receive them, I don't recall seeing them"). The record supports the facts contained in Plaintiff's paragraph 13.

[20] Smith was apparently told about a Director of Solutions Management named "Debbie Swaznika," who made some "in the $200,000 range." [44] ¶ 75. Allscripts' HR found no records of anyone named "Debbie Swaznika" or someone with a similar name. [44] ¶ 76.

industry, ten of which were in director-level positions. [44] ¶ 74. Terry H. did not report to Franks. *Id.*

Skyler W. earned an annual salary of $147,758.16 at the time of Smith's firing. [44] ¶ 78; [48] ¶ 10. Allscripts hired Skyler W. in September 2013 and promoted him to a Director of Product Management in April 2016, a position in which he also reported to Franks. [44] ¶ 78; [48] ¶ 10. A Director of Product Management is typically responsible for the individual features of a product and evaluates product behavior and user interface. [44] ¶ 79. A Director of Solutions Management works on pricing, competition and installation strategy, and profits and loss for the product. *Id.*

Two white, female Directors of Solutions Management in the same geographic area as Smith had lower salaries than she did. [44] ¶ 80.[21]

After Smith was laid off, Allscripts continued with periodic layoffs and, in 2020, fired 763 US-based employees; of those, 90 were Black. [44] ¶ 62.

## III.  Analysis

Smith brings claims under Title VII and § 1981 for race discrimination and under the Equal Pay Act for discrimination in pay on the basis of sex. Smith had

---

[21] Plaintiff seeks to introduce evidence about director-level salaries at Allscripts. *See* [48] ¶¶ 21, 22. Defendant objects to the statements and underlying document, plaintiff's Exhibit E, as inadmissible hearsay and lacking foundation. Plaintiff's Exhibit E contains no indication of when, where, or how it was created, or who created it. Plaintiff does not introduce the document in her Local Rule 56.1 statement of additional facts nor does she attach an affidavit to provide a foundation for the document. As such, it is inadmissible. *See Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 460 (7th Cir. 2014) (evidence supporting or opposing summary judgment must be admissible if offered at trial).

alleged claims of retaliation but noted in her brief that she was voluntarily dismissing those claims. [43] at 5.

### A. Waiver

In its reply brief, Allscripts argues that Smith waived her opposition to its arguments and affirmative defense that Allscripts had legitimate, non-discriminatory reasons for the pay disparity and Smith's termination. [47] at 4. But Smith did argue that, to the extent cost-saving was the primary motivation for her termination, slightly more money could have been saved by laying off a white man who was a Director within the Consumer Business Unit. *See* [43] at 12. She did not, however, respond directly to the affirmative defense and argument that different levels of experience (within the company and at a director-level position) are the reason for the disparity in pay between herself and the two comparators. *See generally* [43] at 7, 10–11 (making arguments about the pay disparity). I take the absence of specific argument to be a sign of the persuasiveness of defendant's points, not an intentional relinquishment of a known right (the classic definition of waiver). Smith attempts to undermine defendant's stated reason for her termination; she has not waived her opposition to summary judgment.

### B. Title VII and Section 1981 Discrimination Claims

Title VII and § 1981 discrimination claims are generally analyzed in the same manner, with a distinction in the causation element—in Title VII cases the plaintiff must show that her protected status is a "motivating factor" in the employer's decision, but in a § 1981 claim, the plaintiff must show that her protected status is

the "but-for cause" of the decision. *See Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022) *citing in part, Comcast Corp. v. Nat'l Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *see also Alexander v. Wis. Dep't Of Health & Family Servs.*, 263 F.3d 673, 681–82 (7th Cir. 2001) ("we analyze § 1981 and Title VII discrimination claims in the same manner").

At the summary judgment stage of an employment discrimination case, the court should ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A plaintiff may rely on any relevant and admissible evidence, whether it be "direct" or "indirect," in carrying her burden. *Id.* Three broad types of circumstantial evidence through which a plaintiff may prove intentional discrimination are: (1) ambiguous or suggestive comments or conduct, (2) better treatment of people similarly situated but for the protected characteristic, and (3) dishonest employer justifications for disparate treatment. *Joll*, 953 F.3d at 929 *citing Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

A plaintiff may also choose to prove her case by using the *McDonnell Douglas* burden-shifting framework. The framework requires an employee to build a *prima facie* case of discrimination by showing: (1) she is a member of a protected class; (2) she was meeting the defendant's legitimate expectations of employment; (3) she suffered an adverse employment action; and (4) similarly situated employees who were not members of her protected class were treated more favorably. *Lewis*, 36 F.4th

at 759. If the plaintiff establishes a *prima facie* case, then the defendant employer has to articulate a legitimate non-discriminatory reason for the adverse action; the plaintiff must then provide evidence that the employer's reason is pretext for discrimination. *Lewis*, 36 F.4th at 759–60. Both parties rely on the *McDonnell Douglas* framework in their briefs.

It is undisputed that Smith is a member of a protected class—she is African American. [44] ¶ 2. Allscripts does not argue that Smith was fired for her job performance and, both parties agree that Smith had overwhelmingly positive reviews and comments during her tenure at Allscripts. *See* [44] ¶¶ 49, 9–12, 15–16, 26 (describing the purported reason for Smith's layoff and her reviews while at Allscripts). The parties diverge on the questions of what treatment constitutes an adverse employment action and whether Smith identified appropriate comparators.

### 1. *Adverse Action*

Smith focuses on four events from her tenure at Allscripts as adverse employment actions: (a) she encountered a "pervasive culture of racism," particularly in her efforts to hire more diverse candidates or to be promoted, (b) she was treated differently than her colleagues within the Consumer Business Unit, (c) she was paid less than other directors, and (d) she was terminated.

"Title VII does not forbid every act of invidious discrimination that an employer might commit against an employee; the act must be with respect to the employee's compensation, terms, conditions or privileges of employment." *Herrnreiter v. Chicago Hous. Auth.*, 315 F.3d 742, 743–44 (7th Cir. 2002) (internal citation omitted). A

15

prohibited act is "a materially adverse employment action … where the plaintiff suffers a significant change in employment status." *Reives v. Ill. State Police*, 29 F.4th 887, 894 (7th Cir. 2022) (internal citation omitted). Adverse employment actions "generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce further career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Id*.

### a. Pervasive culture of racism

Smith describes several episodes and behaviors that led her to feel that there was a "pervasive culture of racism" at Allscripts. [43] at p. 1–2. First, when she became a manager, she wanted to hire more diverse candidates. When she put forth someone she thought was a qualified candidate, however, the candidate was subject to higher degree of scrutiny than usual and she felt that her peers were uncomfortable hiring a racial minority. [48] ¶ 5. Nonetheless, the candidate was ultimately hired. [44] ¶ 14. Smith did not have any other example of difficulty in hiring candidates.

Second, during her tenure, Smith noticed a lack of diversity at Allscripts and shared her critique with HR and upper management. At an unspecified point in time, she spoke with an HR Partner at Allscripts and pointed out that Allscripts lacked diversity among its employees. [48] ¶ 7. Smith did not hear back from HR about her concerns. *Id*. Another time she voiced her opinion that Allscripts would be well-served by recruiting for new employees at historically Black colleges and universities and

that she would be willing to help with the process. [48] ¶ 8. Finally, after the CEO sent an email to the company discussing the effect of racism in the nation and the company, Smith responded, sharing that she had been subject to racism at Allscripts and that she was interested in being part of the solution. [44] ¶ 38.

These incidents may have been frustrating and disheartening, but none of them were targeted at her own employment conditions, a requirement for the kind of "employment action" that is actionable as a Title VII disparate treatment claim.[22] Smith does not provide evidence that her own employment conditions were affected by her colleagues' discomfort with hiring a Black woman or her opinion that Allscripts lacked a diverse workforce.[23] As such, this evidence does not contribute to proof of an adverse employment action—a necessary element of a Title VII or § 1981 race discrimination claim.

### b.      Disparate treatment from supervisor

Smith describes the disparate treatment from Franks as an "hands-off" approach, where Franks would "joke, laugh, and be engaged" with her white colleagues, but would use "the least amount of words" possible with her. [48] ¶¶ 2–3.

---

[22] Smith does not allege a hostile work environment claim.

[23] The closest Smith gets to showing how the alleged "pervasive culture of racism" affected the conditions of her own employment is her testimony that she had to put in more effort to earn promotions, specifically that she had to apply to multiple positions outside of her business unit in order to move up. [44] ¶¶ 67, 68. Loss of an abstract future benefit likely is not an adverse employment action. *See Pierri v. Medline Industries, Inc.*, 970 F.3d 803, 808 (7th Cir. 2020) ("This hypothetical loss of potential future bonuses does not constitute an adverse employment action."). In any case, Smith provides no evidence that others within Allscripts did not have to apply to multiple positions or to positions outside of their business unit in order to be promoted. Without any evidence of comparators, this allegation cannot serve as the basis of a Title VII or § 1981 race discrimination claim.

17

Smith and Franks were supposed to have a weekly call, but it was often cancelled and so they spoke about "once a month." [48] ¶ 1. Smith felt that Franks was not comfortable being the manager of an African American woman. [44] ¶ 69.[24] Smith's experience with Franks does not fall under the first two categories of adverse actions because none of the behavior affected her compensation and her time working under Franks was a promotion that broadened her skill set. The lack of engagement, discomfort, and perceived snubbing are not enough to rise to the level of an adverse employment action under the final category. *See Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 382–83 (7th Cir. 2020) (body language, "cold shoulder," and statements like "be quiet" do not make an actionable, materially changed work environment); *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1107 (7th Cir. 2012) (finding that getting a "cold shoulder" from a boss falls within the non-actionable category); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 462 (7th Cir. 2014) ("Title VII does not protect employees from poor managers or unpleasant and unfair employers.").

---

[24] Allscripts includes a list of the reasons that Smith feels she was discriminated against, including that she was once "asked by a Caucasian female manager to write down her daily tasks while others were asked to fill out a transition template with high-level details." [44] ¶ 67. Smith admits the statement, but never provides any more evidence or detail about the incident. *Id.*; *see generally* plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts, [45]. Even if there were additional evidence of this disparate treatment, it does not rise to the level of an adverse employment action because it is neither an economic injury, a harm to Ms. Smith's prospects, nor was it an "unbearable change in the job condition." *Barton v. Zimmer*, 662 F.3d 448, 453–54 (7th Cir. 2011).

c.      Pay and Termination

A layoff and disparity in pay are quintessential adverse employment actions. *See Reives*, 29 F.4th at 894. These are the only adverse actions that could support Smith's claims for discrimination.

2.      *Comparators and Pretext*

The next step of the *McDonnell Douglas* analysis is to determine if there are employees who are "similarly situated" to Smith and were treated more favorably as to the layoffs and pay. "[T]he similarly-situated inquiry is flexible, common-sense, and factual. It asks essentially, are there enough common features between the individuals to allow a meaningful comparison?" *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012) (internal citation omitted). A court should consider "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Bio v. Fed. Express Corp.*, 424 F.3d 593, 597 (7th Cir. 2005) (internal citation omitted).

a.      Termination

 As a comparator on the question of layoffs, Smith points to Skyler W, a white male Director in the Consumer Business Unit who made $147K a year and was not fired in June 2020. But Smith cannot show that the majority of Skyler W.'s job duties had become obsolete, as her duties were after the end of the BofA "Wellness product"

and the stalled Extended Care "bedside product."[25] *See Tyburski v. City of Chicago*, 964 F.3d 590, 599 (7th Cir. 2020) (appropriate comparator was a hypothetical younger employee who also failed a verbal exam but nonetheless received a promotion). Identifying a comparator here is related to the company's rationale for its employment action. *See Coleman*, 667 F.3d at 841–42 (noting that comparator and pretext analysis are related in employment discrimination cases). The reason that Allscripts gave for Smith's firing is specific to her job and not replicated in other employee's situations, i.e., that cost-cutting reductions were necessary *and* that the main projects for the position had come to an end. Smith has not identified an individual within the Consumer Business Unit who had the major portion of their job duties extinguished, or similar degree of reduction in job responsibilities, yet was retained during the layoffs in spring 2020. *Cf. Dunlevy v. Langfelder*, No. 21-3098, 2022 WL 14772768, at *3–4 (7th Cir. October 26, 2022) (finding that colleague who engaged in different misconduct was still an appropriate comparator because the misconduct was of a similar degree of seriousness).

Neither has Smith produced evidence that shows Allscripts was lying about the reason she was chosen for layoffs. *See Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 726 (7th Cir. 2008) ("A pretext is a deliberate falsehood."). Smith does point out that she was the only person who was terminated effective June 17, 2020, as part of

---

[25] Allscripts does not argue that Smith was fired due to any kind of poor performance that led to end of either project. Indeed, Franks recognized that Smith could not have done anything differently to change the outcome of at least the BOA project. [48] ¶ 14; [45-6] at 48:18–22. Instead, Franks stated that Smith was let go because the end of the projects meant Smith would not have work to do. [45-6] at 75:3–5; 56:19–57:23.

the cost-reduction layoffs, seemingly implying that her termination was not part of the cost-reduction measures. But that inference isn't supported by any evidence; Allscripts has remained consistent that Smith's individual layoff was part of the COVID-19 cost reduction that occurred over time and did involve dozens of people company-wide. *See* [44] ¶ ¶ 40–49, 62; *cf. Joll*, 953 F.3d at 933 (changing rationale for employment decision is indicator of dishonesty, i.e., pretext). Given that consistency and the lack of any evidence of pretext, there is no material issue of fact regarding the reason for Smith's termination.

Finally, an indicator of discrimination in termination cases is what happened to the employee's job after they were fired. In reduction-in-force cases an employee can show discrimination by producing evidence that their position or job duties were replaced by an individual who does not share their protected status. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 846 (7th Cir. 2007) ("the fact that the employer needs to find another person to perform that job after the employee is gone raises the same inference of discrimination that the continuation of a search does in the hiring situation"). Allscripts described Smith's position as "terminated." [44] ¶ 55. Smith herself described what happened as "my position was eliminated." [42-1] at 319. Smith has not proffered any contradicting evidence that others took on her job duties. *Cf. Bellaver v. Quanex Corp.*, 200 F.3d 485, 494–95 (7th Cir. 2000) (finding an issue of material fact because plaintiff was only person fired during a "reduction-in-force" and her job duties were distributed to others who did not share her protected

class). Smith has not raised a material issue of fact regarding the company's non-discriminatory rationale for the termination of her position.

    b.  Pay

  Smith's admissible evidence about other employees' pay at Allscripts is about two individuals—Terry H. and Skyler W.—both of whom are white men who were Directors at Allscripts. [44] ¶¶ 73, 77. Terry H. worked as Director of Solutions Management in a different business unit; he came to Allscripts in 2019 with thirty years' experience in the healthcare field and ten years' experience at a director-level position. [44] ¶ 74.  Experience is the distinguishing factor between Terry H. and Smith—at the time she was let go, Smith had one year of experience as a Director. [44] ¶¶ 23, 55. Furthermore, that difference in experience is the reason Allscripts gives for the difference in pay between the two. [40] at 8; [47] at 7–8. *See Bio*, 424 F.3d at 597 (four years' difference in experience explains difference in treatment). Terry H. is not an appropriate comparator on the issue of pay.

  Skyler W. was Director of Product Management in the Consumer Business Unit. Skyler made $147,758.16 at the time of Smith's layoff, just $2,758.16 more than Smith. [44] ¶ 78, [48] ¶ 10. Skyler was hired by Allscripts in 2013 and had been a Director since 2016. *Id*. Allscripts argues that because  Skyler W. had a different job title, did different work, and had more seniority with the company and more experience at the director-level position than Smith, he is not an appropriate comparator. [47] at 8. I agree. And, as with Terry H., Allscripts states that the difference between Skyler W.'s experience and Smith's experience was part of the

22

reason for their difference in pay. *See* [40] at 8; [44] ¶¶ 20–21 (describing Franks's process for determining pay in which experience is a critical factor). Skyler W. is also not an appropriate comparator on the issue of pay. As such, Smith cannot make the required showing that similarly situated employees were paid more than she was.

### 3. The evidence as a whole

No matter what the *McDonnell Douglas* analysis reveals, a court should step back and consider the evidence as a whole to determine whether a reasonable jury could find that Smith was discriminated against on the basis of her race. *See Joll* at 953 F.3d at 924 (a court should not "ask[] whether any particular piece of evidence proves the case by itself" and instead should "aggregat[e] the evidence to find an overall likelihood of discrimination") (internal citation omitted).

The first step in such a determination is to identify the adverse employment actions, i.e., the employer action that harms Smith and relates to the terms of her employment contract or "the compensation, terms, conditions, or privileges of employment." *See* 42 U.S.C. § 1981(b) and 42 U.S.C. § 2000e-2(a)(1). As discussed above, only Smith's termination and the disparity between her pay and that of Terry H. and Skyler W. are actionable adverse employment actions. *See Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895, 898–99 (7th Cir. 2018) (analyzing pay disparity and terminations as adverse employment actions). Franks's alleged disparate treatment of Smith could serve as evidence of racial animus that motivated her decision to lay Smith off. But Smith's feeling that Franks treated her differently—based on her observation that Franks was hands-on with others—and the fact that

the two women were scheduled to have a weekly phone call that was often cancelled do not support an inference of racial animus. There was no express racial component to Franks's management style, and Smith's import of race as an explanation for the cold shoulder is entirely subjective. Even looking at this claim in the best light, it is not enough to find proof of racial animus. *See Pantoja*, 495 F.3d at 847; *see also Jackson v. Ill. Dep't of Commerce & Econ. Opportunity*, 2022 WL 3009598 at *6 (recognizing that negative racial and gender stereotypes often inform perceptions of Black women in the workplace, but finding lack of evidence of a nexus between race and gender and complained-of behavior) (reviewing § 1983 claim in employment context). This is especially so here because Franks has provided a non-discriminatory rationale for her reason to lay Smith off—that the majority of her work was no longer part of the company's business. [44] ¶ 49. Other evidence in the record—that six other employees (white and Asian) were laid off before Smith and that Allscripts HR sought to find other open positions for Smith—supports the conclusion that no reasonable jury could find that Smith was laid off due to racial discrimination. *See* [44] ¶¶ 45, 61.

The same holds true for Smith's claim that race discrimination caused her to be paid less than other employees at Allscripts. Allscripts has provided a reasonable, non-discriminatory rationale for the difference in pay between Smith and Terry H. and Skyler W, primarily that they had different amounts of experience in a director-level position. Smith has provided no evidence that Allscripts is lying about this reason.

Summary judgment is appropriate for Allscripts on Smith's claims for race discrimination under Title VII and § 1981.

## C.     Equal Pay Act

The Equal Pay Act prohibits discrimination in pay on the basis of sex for "equal work on jobs the performance of which requires equal skills, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In response to a plaintiff who makes a *prima facie* case of discrimination, the employer can show that the pay disparity was justified under: 1) a seniority system; 2) a merit system; 3) a system which measures earnings in quantity or quality of production; or 4) any other factor than sex. *Id.*; *see also Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 793–94 (7th Cir. 2007).

There were male employees at Allscripts who made more than Smith. [44] ¶¶ 73, 78; [48] ¶¶ 10–11. The parties contest whether the comparators identified by Smith really did "equal work requiring equal skills, effort, and responsibility." *Boumehdi*, 489 F.3d at 793. The two comparators for whom Smith submitted admissible evidence are Terry H. and Skyler W. [48] ¶¶ 10–11. As Smith points out, similar working conditions is often a factual determination, ill-suited for determination at summary judgment. *See Soto v. Adams Elevator Equip. Co.*, 941 F.2d 543, 548 (7th Cir. 1991).

However, Allscripts alleges the statutory affirmative defense that the pay disparity was due to reasons for other than sex. *See* [10] at 12–13. The statutory affirmative defense "is a broad catch-all exception that embraces an almost limitless

number of factors, so long as they do not involve sex … Because it is not our province to second-guess the employer's business judgment, we ask only whether the factor is bona fide, whether it has been discriminatorily applied, and in some cases, whether it may have a discriminatory effect." *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1462 (7th Cir. 1994) (internal citations omitted).

Allscripts provided evidence that Terry H. was paid more because he had been in the healthcare field for 30 years and had ten years' experience in a director-level position. [44] ¶ 74. Smith had not been in a director-level position prior to being hired as Director of Solutions Management in 2019. [44] ¶¶ 7, 15, 17–18. At the time of her termination, she had a year of experience in a director-level position. [44] ¶ 23, 55. Allscripts submitted evidence that Skyler W.'s higher pay was due to the fact that he had more seniority than Smith—he had been at Allscripts, and at a director-level position, for a longer period of time than she had been. Skyler W. was hired by Allscripts in 2013; Smith joined the company in 2015. [44] ¶¶ 78, 7. Skyler became a Director of Product Management in 2016 as opposed to Smith's promotion to Director in 2019. [44] ¶¶ 78, 23. Finally, while the amount of pay discrepancy is not determinative, the amount of the discrepancy is relevant to whether the purported basis for the difference in pay is reasonable. *See Sims-Fingers v. City of Indianapolis*, 493 F.3d 768, 771 (7th Cir. 2007) (finding a less-than 2% pay differential justified by differences in responsibilities). Skyler W. was paid approximately $2,000, or about 1.9% more than Smith. Smith has not provided any evidence that controverts the valid reasons Allscripts has given for the pay disparity between herself and Terry H.

and Skyler W. Neither has Smith showed that the company's stated differentials—experience and seniority—are insincere reasons, were applied insincerely, or cause a discriminatory effect. *See Dey*, 28 F.3d at 1462. As such, there is no material issue of fact as to the affirmative defense to Smith's Equal Pay Act claim and summary judgment is appropriate in favor of Allscripts.

## IV.     Conclusion

Defendant's motion for summary judgment, [39], is granted. Enter judgment in favor of defendant and terminate civil case.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: November 3, 2022